(October 26, 2010)

■ BANC OF AMERICA SECURITIES LLC, Respondent, v SOLOW BUILDING COMPANY II, L.L.C., Appellant, et al., Defendant. [911 NYS2d 277]—

Orders, Supreme Court, New York County (Richard B. Lowe, III, J.), entered October 29, 2008, and December 19, 2008, which, inter alia, granted plaintiff's motion to enforce a stipulation of settlement and directed defendant to execute all the documents necessary to effectuate the settlement, modified, on the law, to delete the directive that defendant make a payment of $5 million to plaintiff, and to insert a directive that defendant's obligation to make such payment be submitted to arbitration, and otherwise affirmed, without costs.

The court properly enforced the June 2008 term sheet which recited that it was binding and contained all material terms of the parties' settlement in principle. The requirements to execute the sublease agreement, ostensibly for defendant's benefit to avoid running afoul of a mortgage covenant, and other documents, were not material additions, but were merely intended to effectuate those terms that were material. In fact, plaintiff was ready to vacate the premises on the stipulated schedule, and agreed to turn over possession to defendant, through an affiliate created to honor the mortgage covenant under a sublease. Defendant, however, without stating a reason, refused to execute the settlement agreement.

Plaintiff likewise was not precluded from seeking enforcement despite not having surrendered by the "time is of the essence" deadline provided in the term sheet, since its insistence on defendant's first signing an acceptance of surrender as required by paragraph 23B of the lease (see 99 Realty Co. v Eikenberry, 242 AD2d 215, 216 [1997]) was not a repudiation; in any event, the deadline was extended by agreement. The only reason the surrender did not occur on the scheduled date was defendant's refusal to sign the papers necessary to effectuate the transfer of possession. Under New York law, surrender of leased premises requires acceptance by the landlord in order to become effective (Reisler v 60 Gramercy Park N. Corp., 88 AD2d 312, 318 [1982] ["Surrender does not occur unless there is an unequivocal act of the tenant, accepted by the landlord"]).

The orders enforced a stipulation of settlement, i.e., the term sheet, pursuant to CPLR 2104, and did not confirm an arbitration award. Even if arguendo the orders referred to an award, they did not constitute premature judicial involvement with interlocutory or procedural arbitral rulings (cf. Mobil Oil Indonesia v Asamera Oil [Indonesia], 43 NY2d 276, 281 [1977]).

Defendant did not raise any substantive issues before the arbitrator and waived any supposed procedural deficiencies (*see Morgan Guar. Trust Co. of N.Y. v Solow*, 114 AD2d 818, 822 [1985], *affd* 68 NY2d 779 [1986]). That is, the arbitrator's involvement and retention of jurisdiction over certain matters did not preclude enforcement in court, since defendant failed to present any arbitrable issues to the arbitrator despite the opportunity to do so. Of greater significance is the fact that the orders on appeal did not mention or confirm an arbitration award pursuant to CPLR article 75, but, rather, enforced a stipulation of settlement pursuant to CPLR 2104.

Inasmuch as the parties agreed to arbitrate disputes arising from the term sheet, however, the issue as to whether defendant was required to make a $5 million payment to plaintiff should be decided by the arbitrator (*Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 49-50 [1997] ["New York courts interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration"] [internal quotation marks omitted]).

We have considered defendant's other contentions and find them unavailing.

All concur except McGuire, J., who concurs in a separate memorandum as follows: Although I come to the same place as the majority, I get there by a different road. Explaining our divergence requires the relevant facts to be set forth at some length.

After years of contentious litigation in this action, plaintiff tenant and defendant landlord agreed to mediate their disputes before a retired federal judge, Nicholas H. Politan. In short order, those efforts resulted in an "Agreement in Principle," namely, a three-page "Term Sheet," dated June 10, 2008, designed to provide for a "global resolution and final disposition" of all pending litigation and claims. The term sheet provides that it is governed by New York law, that it is "a legal, valid and binding obligation, enforceable against [each party]," that "all material terms of the settlement in principle . . . are incorporated into this Agreement," that the parties intended to enter into a "definitive" agreement, a "Settlement Agreement," which "will incorporate such terms as may be necessary and appropriate to effectuate the settlement reflected in the [term sheet]" and that the settlement agreement "must be executed . . . by June 24, 2008, or a date thereafter mutually agreed upon." The term sheet also requires plaintiff "to vacate and

surrender" 20 of the floors it leased by August 15, 2008 and the remaining three floors by September 15, 2008. In advance of the expiration of the lease on October 31, 2008, the parties also agreed that "time is of the essence with respect to the Surrender Schedule, and that any delay in complying with this schedule shall be a breach of the Settlement Agreement." Although the term "surrender" is a defined term, the definition is tautological as it is defined to mean little more than "to vacate and surrender the premises." Paragraph 6 of the term sheet effectively provides for plaintiff to receive a total of $15 million from defendant, either through rent reductions for the lease's last three months or, at defendant's option, through a letter of credit in favor of plaintiff. Finally, paragraph 9 provides for "binding arbitration" before Judge Politan of "any disputes arising . . . with respect to this Agreement."

After agreeing to defer the date for execution of the settlement agreement, counsel for the parties drafted and negotiated a draft settlement agreement. As an August 15, 2008 letter from plaintiff's counsel to defendant's counsel states, "as of . . . August 13, we had reached agreement on all open terms, subject only to a final management review on both sides." Nonetheless, the bright prospect of finality raised by the term sheet soon dimmed.

Although the parties had agreed to extend the execution date to August 26, 2008, they did not agree—at least not expressly—to extend past August 15 the deadline for plaintiff to begin surrendering the premises. On August 15, defendant's counsel informed plaintiff's counsel that defendant's management had not approved the draft. In a letter that same day, plaintiff's counsel expressed plaintiff's "surprise[ ] and chagrin[ ]" at being so informed, and stated that plaintiff's management had been willing that day both to execute the draft and surrender the specified 20 floors. Counsel further stated, however, that because defendant was not willing to execute the draft, plaintiff was not willing to proceed with the surrender. By letter dated August 19, 2008, defendant's counsel asserted that under the term sheet, plaintiff's time-of-the-essence obligation to begin surrendering the premises on August 15, 2008 was independent of the obligation of both parties to execute the settlement agreement by an agreed-upon date; plaintiff could have but did not negotiate for its surrender obligation to be contingent on execution of the settlement agreement; a substantial cause of the delay in executing the settlement agreement was plaintiff's "request for a material term never negotiated at the mediation—terminating its obligations under the

Lease prior to October 31, 2008"; defendant was and remained willing to accept surrender of the floors; and defendant would continue to work on coming to agreement on the settlement agreement.

As discussed below, the draft settlement agreement was not executed before the deadline for its execution, which was extended from August 26 to August 29, 2008. A key if not the sole reason it was not executed is that the parties disagreed over whether, under the term sheet, the surrender of the premises entailed a termination of the leasehold as to the surrendered premises. A first draft of the settlement agreement, prepared by defendant's counsel, provided that the lease would remain in effect. Plaintiff, however, contended that under New York law, a "surrender" terminates a lease as to the surrendered premises. According to plaintiff, defendant's counsel informed plaintiff's counsel that defendant could not agree to any early termination of the lease because it was prohibited from doing so by mortgage covenants. In an effort to solve this problem, defendant's counsel proposed and drafted, subject to his client's approval, a sublease arrangement pursuant to which the lease would not terminate on surrender. Rather, pursuant to the terms of subsequent drafts of the settlement agreement, an affiliate of defendant would be created that would assume all of plaintiff's obligations under the lease and defendant would guarantee the affiliate's performance.

Although the parties continued to try to finalize an agreement after the letters of August 15 and 19, they were unsuccessful. Pursuant to paragraph 9 of the term sheet, as is memorialized in an August 28, 2008 letter from plaintiff's counsel to Judge Politan, plaintiff requested that Judge Politan hold a telephone conference on August 29. According to plaintiff's counsel, defendant had offered no "specific explanation" for its refusal to sign the draft settlement agreement. During the telephone conference, which began at 2:00 P.M. on August 29, the Friday marking the start of the Labor Day weekend, Judge Politan directed defendant to advise him by 10:00 A.M. on Tuesday, September 2 of its objections to executing the draft settlement agreement. Judge Politan also stated that if he did not receive defendant's objections by that time, he would issue an order on September 3 directing defendant to execute the draft settlement agreement. Although defendant did not make any submission on September 2, Judge Politan did not issue the order. Rather, defendant's counsel requested that plaintiff's counsel ask Judge Politan to hold off to give defendant additional time to execute the draft settlement agreement

voluntarily. Plaintiff agreed to the request and to have the order held until September 8.

On September 8, however, defendant's counsel sent Judge Politan a letter requesting that he not issue the order requested by plaintiff, but instead schedule an arbitration hearing. The five-page letter set forth defendant's legal position that plaintiff was required to surrender the 20 floors on August 15 regardless of whether the settlement agreement had been executed by that date. In addition, defendant objected that plaintiff could not both fail to surrender the 20 floors as required by the term sheet and claim it was entitled under the term sheet to a $5 million rent reduction. Counsel contended as well that negotiations over the settlement agreement had taken longer than expected because plaintiff had requested terms not provided for in the term sheet, including "a form of staggered lease termination upon surrender of the premises." After raising additional issues, counsel argued, inter alia, that: the holiday weekend had impaired defendant's ability to lodge objections by September 2; no irreparable injury supported the requested relief, i.e., an order directing a form of specific performance, i.e., execution of the settlement agreement; and issuance of the order would not be "legally appropriate because it would involve imposing terms not requested in the [term sheet]."

That same day, plaintiff's counsel argued in a responsive letter that defendant had failed to identify within the time frame specified by Judge Politan any areas of disagreement regarding the language of the drafts of the settlement agreement, and asked Judge Politan to "enter an order" requiring defendant to execute the settlement agreement. Counsel went on to state plaintiff's belief that, "[a]s for the balance of the issues raised by [defendant's counsel's] letter," they were without merit. Although imprecise, the phrase "balance of the issues raised" must be understood to include defendant's objection to plaintiff's claim of entitlement to a $5 million rent reduction. Counsel stated that a detailed response to those issues would be forthcoming and urged that "it would be appropriate for Your Honor to retain jurisdiction, following entry of the order, to resolve those or any other issues either party wishes to raise pursuant to paragraph 9 of the [term sheet]."

On September 9, Judge Politan issued an "Order by Arbitrator" setting forth, inter alia, his determination that the issues raised by the parties in their September 8 letters "are not substantial and should not preclude the signing of the Settlement Agreement and . . . there is no substantive reason why the Settlement Agreement cannot be executed with the Arbitra-

tor retaining jurisdiction under Paragraph 9 of the [term sheet]." Accordingly, Judge Politan ordered defendant to execute the draft settlement agreement forthwith and directed arbitration before him, at a date to be scheduled, of the "minor" issues raised in the September 8 letters.

When defendant did not immediately comply, plaintiff sought to compel it to execute the draft settlement agreement. In addition, plaintiff sought relief it had not sought from Judge Politan. That is, plaintiff sought an order requiring defendant to pay it the $5 million it claimed it was entitled to under the term sheet, and to execute the sublease provided for in the draft settlement agreement, acceptances of the surrender of the premises and a stipulation of discontinuance of this action.

Plaintiff did not commence a proceeding pursuant to article 75 of the CPLR to confirm Judge Politan's award as a preliminary step in obtaining this relief. Indeed, plaintiff has been careful not to refer to the September 9 "Order by Arbitrator" as an "award." Rather, two days after the order was issued, plaintiff sought the above-described relief by moving pursuant to CPLR 2104, via order to show cause, to "enforc[e] the settlement between the parties dated June 10, 2008," i.e., the term sheet.[1] As discussed below, defendant opposed the motion.

Ruling from the bench after oral argument, Supreme Court granted the motion. Although plaintiff was not seeking to confirm the September 9 award, Supreme Court expressed its "belief and position that Judge Politan's order is binding and enforceable." Supreme Court reasoned that "the term sheet which has been signed by both parties reflect[s] all the material terms of the settlement which means that there was a settlement agreement which is enforceable. What has been awaiting is the [implementing] documentation . . . , but there was a meeting of the minds and there was an agreement by both sides as to how those issues should be resolved." After finding it "somewhat disingenuous" for defendant to argue that "delay"— apparently delay by plaintiff in surrendering the premises— constituted a breach by plaintiff when that delay "was to give

---

1. Why plaintiff sought no relief pursuant to CPLR article 75 is unclear. Of course, however, an order that simply confirmed the September 9 award would not have provided plaintiff with the additional relief it sought, the relief it had not sought before Judge Politan. In addition, plaintiff may have determined that a proceeding to confirm so much of the September 9 award as directed defendant to execute the draft settlement agreement might be defeated on the ground that the award was not final (see CPLR 7511 [b] [1] [iii]; Matter of Otto C. Prellwitz & Son [12-10 Thirtieth Ave. Corp.], 24 AD2d 1030 [1965] [to be confirmed, arbitration award "must be final and definite"]).

[defendant's principal] the opportunity to sign the terms," Supreme Court concluded its explanation as follows: "As you know, it is within the power of the Court to order the execution of the written agreement which fully represents the terms of the stipulation, and I would just cite *Cost v Benetos*[(277 App Div 880 [1950])], 97 NYS2d 799."

A written order, dated October 29, 2008, granting the above-described relief was issued and effectively amended by a second order, dated December 19, 2008, setting a different date for compliance, December 30, 2008. Prior to the issuance of the amended order, and after the lease expired by its terms on October 31, 2008, defendant deposited $5 million with the clerk of the court. It also executed, inter alia, a copy of the draft settlement agreement along with a "Statement of Protest" and deposited the document with the clerk. This appeal by defendant from both orders followed.

Defendant advances numerous arguments for reversal, in whole or in part, of the orders. Most of the arguments supporting reversal of so much of the orders as compelled execution of the settlement agreement are set forth in the balance of this paragraph. While conceding the binding and enforceable character of the term sheet, defendant contends that Supreme Court was without authority to order execution of the draft settlement agreement because that document went beyond the term sheet and contained new and material terms to which it never had agreed. In this regard, defendant argues that the term "surrender" in the term sheet was not a term of art but was used in a colloquial sense that did not entail an early termination of the lease, and that the sublease provisions were proposed by its counsel in an attempt to accommodate plaintiff's improper insistence that the lease terminate as floors were surrendered. Accordingly, defendant maintains that it was free not to agree to the sublease provisions and should not have been compelled to execute any agreement containing those provisions. Relatedly, defendant argues that it should not have been required to execute the draft settlement agreement because plaintiff breached the term sheet when it failed to comply with its unconditional obligation to surrender the premises in a timely fashion. Defendant's other arguments include the contention that having elected to arbitrate the dispute, plaintiff was foreclosed from seeking any judicial intervention other than through a proceeding under article 75 of the CPLR to confirm a final arbitration award.

These contentions, however, are not preserved for review. Indeed, with one exception, all of defendant's other arguments

for reversal of so much of the orders as required it to execute the draft settlement agreement are not preserved for review. At oral argument before Supreme Court, defendant's counsel stated that "[t]he legal arguments . . . that can be advanced and [are] set forth in our papers are essentially two." The first argument was expressly limited to that branch of plaintiff's motion that sought to compel the $5 million payment. Counsel stated that the first legal argument "is that while one of [plaintiff's] request[s] is to enforce the provision requiring a payment of five million dollars which was part of a way of implementing the settlement agreement from June [i.e., the term sheet], [opposing counsel] accurately described my client's belief that there is a dispute still pending before Judge Politan regarding that payment." Counsel went on to explain that this dispute was the one that arose when plaintiff did not begin surrendering the premises on August 15. Counsel concluded his statement of the first legal ground as follows: "My client . . . would assert that [plaintiff] didn't vacate, and therefore my client shouldn't need to pay the rent rebatement. I believe that is in essence what my client would assert before Judge Politan. In any event, the legal point is that the matter was made before Judge Politan and [is] not here yet." The "second legal point" counsel raised was that a request for specific performance "ordinarily require[s] a showing of some irreparable injury" and that plaintiff had not made such a showing.

Only this second legal point is an objection to plaintiff's motion for an order requiring execution of the draft settlement agreement. By its clear terms, the first legal point applies only to plaintiff's request for an order requiring the $5 million payment. Accordingly, in opposition to the request for an order requiring execution of the draft Settlement Agreement, defendant has preserved for review only the latter of these two arguments (*Murray v City of New York*, 195 AD2d 379, 381 [1993]).

To be sure, in opposition to plaintiff's motion, defendant submitted an affirmation by one of its attorneys that stated the relevant facts at some length. In doing so, the affirmation recounted defendant's position that plaintiff had failed to satisfy its obligation under the term sheet to surrender the premises in a timely fashion; the draft settlement agreement contained terms that differed from or added to those of the term sheet; and the term sheet required arbitration before Judge Politan of any dispute. The affirmation also stated that defendant had outlined in the September 8 letter to Judge Politan (a copy of which was among the exhibits to the affirmation) "the relevant legal principles that it believed prohibited the issuance of an or-

der directing [it] to execute the [draft] Settlement Agreement." The affirmation, however, did not state that defendant was embracing anew those same legal principles. More critically, at oral argument defendant never urged the court to deny the motion on the basis of either the positions recounted in the affirmation or the principles of law stated in the September 8 letter. Rather, at oral argument defendant expressly stated that the two legal arguments it advanced were the only legal arguments it was making in opposition to the motion.

I recognize that plaintiff has not objected on appeal that these arguments for reversal are unpreserved. I recognize, too, that certain of those arguments may be ones that defendant could be permitted to raise on appeal for the first time (*Telaro v Telaro*, 25 NY2d 433 [1969]; *Matter of Travelers Indem. Co. [Levy]*, 195 AD2d 35, 41 [1993]). For several reasons, however, I would nonetheless decline to review them on preservation grounds. In the first place, the conclusion that defendant preserved only the two arguments it advanced at oral argument before Supreme Court is inescapable. I am not much troubled, accordingly, that defendant had no occasion to address preservation in its reply brief. Second, preservation requirements serve important public goals of finality and judicial economy (*cf. People v Dekle*, 56 NY2d 835, 837 [1982]). At least the latter goal is served by declining to review defendant's arguments on preservation grounds. Regardless of whether the majority is correct in concluding both that the term "surrender" in the term sheet was intended by the parties to be understood in a technical rather than a colloquial sense and that plaintiff's obligation to surrender was not unconditional, I think it far from clear that these issues can be resolved as a matter of law on the existing record. Third, the only reasonable conclusion is that defendant made a considered decision when it limited its opposition to the motion to the two legal grounds advanced at oral argument. After all, defendant was represented by highly capable counsel and the affirmation in opposition set forth at least the factual basis for the unpreserved contentions. As indicated immediately below, moreover, defendant reasonably could have determined not to advance those contentions.

Fourth, defendant may well have determined there was little if anything to be gained by pressing these contentions that Supreme Court should not order it to execute the draft settlement agreement. Success would not have invalidated Judge Politan's order. Rather, unless Judge Politan rescinded his order, denial of plaintiff's motion would only have postponed the day of reckoning on this issue. Defendant reasonably could have

concluded that at the end of the day it was quite unlikely that Judge Politan would change his mind. After all, even putting aside for a moment that the expiration of the lease was imminent, defendant's principal objection to the terms of the draft settlement agreement is that the sublease provisions represent material terms not contained in the term sheet and to which it never agreed. That may be a formidable legal objection, but just the same the sublease provisions hardly saddled defendant with an onerous burden. As Judge Politan undoubtedly appreciated, defendant's counsel proposed the sublease arrangement for precisely that reason.[2] By contrast, of course, defendant had much to gain by persuading Supreme Court not to order it to pay plaintiff $5 million.

Fifth, and relatedly, whether Supreme Court erred in ordering defendant to execute the draft settlement agreement appears to be a tempest in a teapot. Presumably, or so the parties seem to assume, the draft settlement agreement and other documents (the sublease and stipulation of discontinuance) executed by defendant under protest would be rendered legal nullities by an order from this Court reversing so much of Supreme Court's orders as required their execution. But it is not at all clear that either such an order or an order affirming Supreme Court's orders in this respect would directly affect the rights of the parties (*see Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714 [1980]). As noted, defendant's principal objection to the draft settlement agreement is to its sublease provisions. By the time the draft settlement agreement was executed under protest, the lease had expired by its own terms. The parties acknowledge in their briefs that the sublease provisions thereby were rendered moot, and defendant also concedes that the draft settlement agreement contained "provisions concerning surrender of premises that were moot by the time the court below heard the motion." Indeed, defendant acknowledges that "most of the material terms of [the draft settlement agreement] were obsolete by the time" Supreme Court issued its written order. Moreover, the parties concede the binding and enforceable character of the term sheet. Accordingly, determining whether Supreme Court erred in directing execution of the draft settlement agreement and the two other documents would appear to be pointless unless some provision of one of these documents that is *not* duplicated in the term sheet continues to have significance for

---

**2.** If the sublease provisions had been effectuated, moreover, defendant would have received the very benefit that it contends the surrender provisions were designed to provide, i.e., possession of the premises to prepare them to be leased anew promptly upon the expiration of the lease.

the rights of the parties. We are not directed by the parties to any such provision.

Turning to defendant's contention that a showing of irreparable harm "ordinarily" is required and that plaintiff failed to make it, I would reject it because the term sheet, the contract at issue, is a stipulation of settlement enforceable under CPLR 2104.[3] Defendant cites no authority requiring a showing of irreparable harm to enforce a stipulation of settlement. Regardless of whether it might be appropriate in some other case, I see no reason to require a showing of irreparable harm in this case and defendant does not offer one (at least not one independent of its unpreserved claim that the term sheet contains new and material terms to which it never agreed).

I agree with the majority that the first "legal point" defendant raised before Supreme Court, that plaintiff's request for an order directing the $5 million payment provided for in the term sheet should be denied because a dispute over the payment was pending before the arbitrator, has merit. The dispute over the payment falls squarely within the broad arbitration provision of the term sheet requiring arbitration of "any disputes arising . . . with respect to this Agreement"; in its September 8 letter to Judge Politan, defendant disputed plaintiff's claim of entitlement to the payment and requested an arbitration hearing; plaintiff can only be understood to have included issues relating to this dispute within the issues it urged Judge Politan to retain jurisdiction over in its September 8 letter; and this dispute unquestionably was one of the "issues" Judge Politan retained jurisdiction over and ordered arbitrated in his September 9 order. Moreover, of course, just days before seeking judicial intervention, plaintiff had successfully sought and obtained a favorable ruling from Judge Politan pursuant to the arbitration provision of the term sheet (see Roggio v Nationwide Mut. Ins. Co., 66 NY2d 260, 263 [1985] ["parties are not permitted to participate in arbitration on the merits and yet maintain a right to litigate the issues"]).

Plaintiff's various arguments in response are unpersuasive. According to plaintiff, there was no arbitrable issue for Judge Politan to resolve because, "despite being given ample time to do so, [defendant] never identified for Judge Politan any reason for its unwillingness to execute the Settlement Agreement."

---

**3.** I do not understand defendant to contend that this argument is applicable to the provisions of the term sheet requiring the $5 million payment. Obviously, it makes no sense to require a showing of irreparable harm from a party seeking enforcement of a contractual provision for the payment of money.

The most that can be said, however, is that defendant did not provide any such reasons before the expiration of the deadline Judge Politan had set, the morning of September 2. Albeit belatedly, defendant raised numerous issues in its September 8 letter. As defendant correctly contends, although Judge Politan could have found that its failure to comply with the September 2 deadline waived the contentions raised in its September 8 letter, Judge Politan did not so find. To the contrary, he ordered that the "issues raised in the letters of September 8, 2008 from both parties be subject to binding arbitration" at a date to be set.

Neither Judge Politan's characterization of the issues raised in the September 8 letters as "minor" nor plaintiff's characterization of those raised by defendant as "separate" from the relief sought from Supreme Court are relevant to the arbitrability of the dispute over the $5 million payment. Similarly irrelevant is plaintiff's assertion that "there is no colorable question as to [its] entitlement to that payment." In essence, plaintiff argues that there is no dispute because the underlying legal questions (whether the term "surrender" was used in the term sheet in a colloquial sense or as a term of art and whether its right to receive the $5 million payment is conditioned on timely compliance with its surrender obligation) are easy questions that can and should be resolved in its favor as a matter of law. But we could not properly express an opinion on these questions even if we were to agree. A dispute committed exclusively to arbitration arose because and as soon as the parties disagreed on these questions.

Relying on *American Reserve Ins. Co. v China Ins. Co.* (297 NY 322 [1948]), plaintiff argues that because defendant did not move to compel arbitration it could not argue before Supreme Court that an arbitrable dispute existed that required denial of the motion to compel the $5 million payment. *American Reserve*, however, was decided under a section of the former Civil Practice Act, and plaintiff cites no case construing the CPLR to hold under these circumstances that the only defense is a good offense, i.e., that a party cannot oppose judicial intervention into a dispute on the ground that it is foreclosed by an arbitration agreement except by moving under CPLR 7503 (a) to compel arbitration of that dispute. To reject defendant's opposition to judicial intervention into the dispute over the payment because it did not advance the same position in its own motion would both exalt form over substance and favor litigation over arbitration despite "the long and strong public policy favoring arbitration" (*Matter of Smith Barney Shearson v Sacharow*, 91

NY2d 39, 49 [1997]). Finally, although plaintiff protests that defendant never pursued arbitration before Judge Politan after Supreme Court issued the orders requiring defendant to execute the draft settlement agreement and make the $5 million payment, plaintiff does not explain why defendant could not conclude that arbitration was pointless unless the orders were reversed or modified on appeal.

I would not address defendant's other arguments for reversal of so much of the orders as directed it to make the $5 million payment. Defendant expresses apprehension that although the release provisions of the draft settlement agreement do not apply to breaches of the settlement agreement and a failure by plaintiff to comply in timely fashion with its surrender obligation is defined to be a breach of the settlement agreement, plaintiff nonetheless will claim that it has been released of any liability for such a breach. Any dispute about the scope of the release provisions, however, will be a matter for Judge Politan. Without expressing a position with respect to the scope of the release provisions, I note that by reversing so much of the orders as granted the motion to enforce and required defendant to make the $5 million payment, we permit the parties to arbitrate their claims relating to the payment. Concur—Gonzalez, P.J., Saxe, McGuire, Acosta and Román, JJ.